**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEVADA**
**LAS VEGAS DIVISION**

| | |
|---|---|
| UNITED STATES COMMODITY FUTURES TRADING COMMISSION, | **Civil Action No. 2:16-CV-01938-GMN-NJK** |
| Plaintiff, | **PLAINTIFF'S COMBINED MOTIONS AND MEMORANDA FOR SUMMARY JUDGMENT AGAINST DEFENDANT SCHACKE AND DEFAULT JUDGMENT AGAINST DEFENDANT TRADEMASTERS AND REQUEST FOR A PERMANENT INJUNCTION AND OTHER RELIEF AGAINST BOTH DEFENDANTS** |
| v. | |
| TRADE MASTERS, USA, LLC and MIRKO SCHACKE, an individual, | |
| Defendants. | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

I.   INTRODUCTION ...................................................................................1

II.   SUMMARY JUDGMENT STANDARD – MOTION AGAINST SCHACKE ...............2

III.   LEGAL STANDARD FOR ENTRY OF DEFAULT JUDGMENT and
       SATISFACTION OF THE PROCEDURAL REQUIREMENTS – MOTION
       AGAINST TRADEMASTERS ............................................................3

   A.   The Plaintiff will be Prejudiced Absent the Entry of a Default Judgment..................4

   B.   The Plaintiff's Complaint Sets Forth a Claim for Relief and Properly Pleads
        Violations of the Act and Regulations ........................................................4

   C.   The Requested Monetary Relief is Proportional to TradeMasters' Conduct ............5

   D.   Material Facts are Not in Dispute ........................................................6

   E.   TradeMasters' Default is not Attributable to Excusable Neglect ...............................6

   F.   Decision on the Merits ........................................................................7

IV.   STATEMENT OF FACTS FOR WHICH THERE IS NO GENUINE DISPUTE .........7

   A.   Background Facts And Facts Demonstrating That Schacke Was Acting
        On Behalf Of Trademasters ........................................................7

   B.   The Defendants  Fraudulently Solicited Investors To Buy Trademasters'
        Trading Software ........................................................................8

   C.   Trademasters Acted As A Commodity Trading Advisor And Schacke
        Acted As An Associated Person ........................................................13

   D.   Trademasters Failed To Provide Required Disclosures Concerning
        Testimonials ........................................................................15

V.   LEGAL ARGUMENT ........................................................................15

   A.   TradeMasters and Schacke Committed Fraud in Violation of
        Section 4b(a)(1)(A) and (C) of the Act (Count One)....................................15

1.     Defendants Made Misrepresentations ........................................16

2.     Defendants Acted With Scienter ...........................................16

3.     Defendants' Misrepresentations Were Material ..................19

B.   Fraud by Manipulative or Deceptive Devices or Contrivances (Count Five) ...........20

C.   TradeMasters Failed to Register as a CTA (Count Two) ...........................21

D.   Schacke Failed to Register as an Associated Person (Count Three) ........................22

E.   Fraud by a CTA and an AP of a CTA (Count Four) ............................22

F.   TradeMasters Failed to Provide Required Disclosures (Count Six) ........................24

G.   Derivative Liability .......................................................24

1.     Controlling Person Liability for Schacke ..........................24

2.     TradeMasters is Liable as Principal for Schacke's Acts ..................26

VI.   RELIEF SOUGHT ........................................................26

A.   The Court Should Permanently Enjoin the Defendants from Future Violations ........................................................26

B.   Additional Injunctive and Remedial Relief is Warranted ..........................27

C.   The Court Should Order Defendants to Disgorge Their Gains..........................28

D.   The Court Should Impose a Substantial Civil Monetary Penalty Against Defendants ........................................................29

VII. CONCLUSION ........................................................30

# TABLE OF AUTHORITIES

## Cases

*Aldabe v. Aldabe*, 616 F. 2d 1089, 1092 (9th Cir. 1980) ................................................................4

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) ........................................................2, 3

*Apache Trading Corp.,* [1990-1992 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 25,251,
     at 38,795 (CFTC Mar. 11, 1992) ..........................................................................................25

*BMW of No. Am., LLC v. Quality Star Benzz, LLC,* No. 2:12-cv-00889,
     2013 WL 1338233, at *4 (D. Nev. Mar. 29, 2013) ...........................................................5, 6

*British Am. Commodity Options Corp.*, 560 F.2d at 142 ...............................................................26

*C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.,* 213 F. 3d 474, 480 (9th Cir. 2000) ...........3

*Cange v. Stotler & Co. Inc.*, 826 F.2d 581 (7th Cir. 1987) ...........................................................17

*Celotex Corp. v. Catretti,* 477 U.S. 317, 322 (1996) .................................................................2, 3

*CFTC ex rel. Kelley v. Skorupskas*, 605 F. Supp. 923, 932 (E.D. Mich. 1985) .........................23

*CFTC v. American Metals Exchange Corp.,* 991 F. 2d 71, 76 (3rd Cir. 1993) ............................28

*CFTC v. Baragosh*, 278 F.3d 319 (4th Cir. 2002) ................................................................19, 28

*CFTC v. British Am. Commodity Corp.,* 788 F. 2d 92, 94 (2d Cir. 1986) ..................................28

*CFTC v. CIS Commodities, LLC, et al.,* 2013 WL 1944571 (D. Nev. 2013) .........................4, 28

*CFTC v. Commonwealth Fin. Group*, 874 F. Supp. 1345 (S.D. Fla. 1994) ...............................19

*CFTC v. Driver*, 877 F.Supp.2d 968, 978 (C.D. Cal. 2012), *aff'd* 585 Fed. Appx. 366
     (9th Cir. Oct. 7, 2014) ..........................................................................................................19

*CFTC v. Hall*, 49 F.Supp.3d 444, 450 (M.D.N.C. Sept. 30, 2014), *aff'd* 632 Fed. Appx. 111
     (4th Cir. Dec. 9, 2015) ....................................................................................................22, 24

*CFTC v. Hunt,* 591 F. 2d 1211, 1219 (7th Cir. 1979), *cert. denied,* 442 U.S. 921(1979) ............27

*CFTC v. Hunter Wise*, 21 F. Supp. 3d 1317, 1347 (S.D. Fla. 2014) ..........................................20

*CFTC v. Kratville*, 796 F.3d 873, 891 (8th Cir. 2015) ...............................................................16

*CFTC v. Levy,* 541 F. 3d 1102, 1113 (11th Cir. 2008) ...............................................................28

*CFTC v. Noble Wealth Data Information Servs, Inc*., 90 F. Supp. 2d 676, 686
     (D. Md. 2000) ................................................................................................................19, 28

iii

*CFTC v. R.J. Fitzgerald & Co., Inc.*, 310 F.3d 1321, 1328 (11th Cir. 2002),

   *cert. denied*, 543 U.S. 1034 ( 2004) ........................................................16, 24, 25

*CFTC v. Savage*, 611 F.2d 270, 285 (9th Cir. 1979) .............................................23

*CFTC v. Sidoti*, 178 F.3d 1132 (11th Cir. 1999) ...................................................26

*CFTC v. Vartuli*, 226 F.3d 94, 111 (2d Cir. 2000) ................................................21

*CFTC v. White Pine Trust Corp.*, 2007 WL 1754819 *7 (S.D. Cal. Apr. 20, 2007)...................27

*CFTC v. Wilshire Investment Management Corp.*, 531 F. 3d 1339 (11th Cir. 2008)...................28

*Chu v. CFTC*, 823 F.3d 1245, 1251 (9th Cir. May 25, 2016)........................................17

*Commodity Trend Service, Inc. v. CFTC*, 233 F.3d 981, 993 (7th Cir. 2000)...........................23

*Danning v. Lavine*, 572 F. 2d 1386, 1389 (9th Cir. 1978)...........................................4

*Davis v. Fendler*, 650 F. 2d 1154, 1161 (9th Cir. 1981)...........................................5

*Dohmen-Ramirez v. CFTC*, 837 F. 2d 847, 857-58 (9th Cir. 1988) ...................................26

*Drexel Burnham Lambert, Inc. v. CFTC*, 850 F.2d 742 (D.C. Cir. 1988)...............................17

*Eitel v. McCool*, 782 F. 2d 1470, 1471 (9th Cir. 1986) ........................................3, 4, 7

*F.T.C. v. Am. Standard Credit Sys.*, 874 F. Supp. 1080, 1089 (C.D. Cal. 1994).......................17

*First Nat. Monetary Corp. v. Weinberger*, 819 F. 2d 1334, 1342 (6th Cir. 1987) ......................23

*Franchise Holding II, LLC v. Huntington Restaurants Group, Inc.*, 375 F. 3d 922, 929

   (9th Cir. 2004)...................................................................................5

*FTC v. Affordable Media*, 179 F. 3d 1228, 1235 (9th Cir. 1999) ...................................17

*FTC v. Garvey*, 383 F. 3d 891, 900 .............................................................17

*FTC v. Publ'g Clearing House, Inc.*, 104 F. 3d 1168, 1171 (9th Cir. 1997)...........................17

*Hammond v. Smith Barney Harris Upham & Co.*, [1987-1990 Transfer Binder]

   Comm. Fut. L. Rep. (CCH) ¶ 24,617 (CFTC Mar. 1, 1990) ....................................16

*In re First Nat'l Trading Corp.*, [1992-1994 Transfer Binder] Comm. Fut. L. Rep.

   (CCH) ¶ 26,142, at 41,787 (CFTC July 20, 1994), *aff'd without opinion sub*

   *nom. Pick v. CFTC*, 99 F.3d 1139 (6th Cir. 1996).........................................25

*In re Grossfeld*, [1996-1998 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,921

   at 44,467-8 (CFTC Dec. 10, 1996), 1996 WL 709219 (CFTC); *aff'd sub nom.*

   *Grossfeld v. CFTC*, 137 F. 3d 1300 (11th Cir. 1998). ....................................29

*In re Kolter*, [1994-1996 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,262
at 42,198 (CFTC Nov. 8, 1994) (aff'g grant of summary disposition)....................................23

*In re Miller*, [1994-1996 Transfer Binder] CCH ¶26,440 at 42,914 (CFTC June 16, 1995)........27

*In re R&W Technical Servs. Ltd.*, [1998-1999 Transfer Binder] Comm. Fut. L. Rep.
(CCH) ¶ 27,582, 1999 CFTC LEXIS 50, at *80 (CFTC Mar. 16, 1999),
*aff'd in part R&W Technical Serv. Ltd. v. CFTC*, 205 F.3d 165 (5th Cir. 2000) ....................23

*In re Slusser*, [1998-1999 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 27,701,
1999 CFTC LEXIS 167 at *27, 1999 WL 507574 at *9 (CFTC July 19, 1999)...............16, 24

*In re Spiegel*, [1987-1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,103,
at 34,767 (CFTC Jan. 12, 1988)..........................................................................................25

*In re Staryk,* [2003-2004 Tranfer Binder] Comm. Fut. L. Rep. (CCH) ¶29,826
at 56,452 (CFTC July 23, 2004) .........................................................................................27

*JCC, Inc.,* 63 F.3d at 1568 .................................................................................................25, 29

*Kloepping v. Fireman's Fund*, No. C 94-2684 THE, 1996 WL 75314,
at *3 (N.D. Cal. Feb. 13, 1996).............................................................................................7

*Lawrence v. CFTC*, 759 F. 2d 767 (9th Cir. 1985)..................................................................17

*Liberty Ins. Underwriters Inc. v. Scudier*, 53 F. Supp. 3d 1308, 1318 (D. Nev. 2013)................4

*Lindy Pen Co. v. Bic Pen Corp.*, 982 F. 2d 1400, 1407 (9th Cir. 1993) .........................................6

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) ............................3

*Messer v. E.F. Hutton & Co.*, 847 F.2d 673, 678-79 (11th Cir. 1988) .......................................23

*Miller v. CFTC,* 197 F. 3d 1227 (9th Cir. 1999)...............................................................27, 29

*Next Gaming, LLC v. Global Gaming Group, Inc.,* No. 2:14-cv-00071,
2016 WL 3750651 (D. Nev. July 13, 2016) .............................................................................7

*Pepsi Co., Inc. v. California Sec. Cans*, 238 F. Supp. 2d 1172, 1177 (C.D. Cal. 2002) ....4, 5, 6, 7

*Rosenthal & Co. v. CFTC*, 802 F. 2d 963, 966 (7th Cir. 1986).................................................26

*SEC v. Cavanagh, et al.,* 445 F. 3d 105, 117 (2nd Cir. 2006)..................................................29

*SEC v. Fischbach Corp.,* 133 F. 3d 170, 175-76 (2nd Cir. 1997)..............................................29

*SEC v. Ginsburg,* 362 F. 3d 1292, 1304 (11th Cir. 2004) ......................................................27

*SEC v. Warren,* 534 F. 3d 1368, 1370 n. 2 ...........................................................................29

*Slusser v. CFTC*, 210 F.3d 283 (7th Cir. 2000) ..............................................................16

*TeleVideo Sys., Inc. v. Heidenthal*, 826 F. 2d 915, 917-18 (9th Cir. 1987)......................3

*Toyo Tire and Rubber Co., Ltd., et al. v. Toyama Tyre Corp., Ltd., et al.,*

   2014 WL 4987876 (D. Nev. 2014) ................................................................................4

*TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438 (1976) ........................................19

*Warner Bros. Entm't Inc. v. Caridi,* 346 F. Supp. 2d 1068, 1071 (C.D. Cal. 2004) ......................4

*Wasnick v. Refco, Inc.*, 911 F.2d. 345 (9th Cir. 1990)......................................................16

*Wecosign, Inc., v. IFG Holdings, Inc. et al.,* 845 F. sup. 2d 1072, 1079 (C.D. Cal. 2012) ............5

## Statutes

7 U.S.C. § 13a(c)(d)(1) ................................................................................................6, 29

7 U.S.C. § 13a-1(c)(1)(A) ...............................................................................................30

7 U.S.C. § 13c(b) (2012)............................................................................................24, 26

7 U.S.C. § 2(a)(1)(B) ..................................................................................................5, 26

7 U.S.C. § 4b(a)(1)(A), (C) (2012) .................................................................................15

7 U.S.C. § 6b(a)(1)(A) and (C) .......................................................................................19

7 U.S.C. § 6k(3) (2012) ...................................................................................................22

7 U.S.C. § 6m(1) (2012) .............................................................................................21, 26

7 U.S.C. § 6o(1) .........................................................................................................22, 26

7 U.S.C. §§ 1 *et seq.* (2102)...............................................................................................1

7 U.S.C. §§ 6o(1)(A) and (B) ..........................................................................................23

## Rules

Fed. R. Civ. P. 4(e)(2) ........................................................................................................6

Fed. R. Civ. P. 55(a) ..........................................................................................................3

Fed. R. Civ. P. 56(c) ......................................................................................................2, 3

Fed. R. Civ. P. 8 .................................................................................................................4

Fed. R. Civ. P. 8(b) ............................................................................................................7

## Regulations

17 C.F.R. § 1.2 ..............................................................................................................5, 26

17 C.F.R. § 143.8 ..........................................................................................................6, 29

17 C.F.R. § 4.41(a)(3) ...................................................................................................24

17 C.F.R. § 4.41(a)(3) and 180.1(a) (2015) ...................................................................26

17 C.F.R. §§ 1 *et seq.* (2015) ...........................................................................................1

## I.     <u>INTRODUCTION</u>

The Plaintiff, U.S. Commodity Futures Trading Commission ("CFTC" or "Commission"), hereby files its Combined Motions and Memoranda for Summary Judgment against Defendant Mirko Schacke, and Default Judgment against Defendant TradeMasters and Request for a Permanent Injunction and Other Relief Against Both Defendants.  In its Complaint filed on August 15, 2016 [Doc. No. 1] the CFTC charged Mirko Schacke a/k/a "Mick" Schacke ("Schacke") along with co-Defendant TradeMasters USA, LLC ("TradeMasters") (collectively "Defendants") with fraudulently soliciting and accepting money from customers who purchased automated trading software that they sold under the TradeMasters name.[1]  *Ex. 15 ¶ 5 (Ex.A)* total of $168,626 was solicited from 39 customers.  The Defendants made numerous misrepresentations about the past trading results of their trading system to these investors and used false and misleading customer testimonials to solicit investors to buy their software and thereby violated the anti-fraud provisions of the Commodity Exchange Act ("CEA" or "Act"), 7 U.S.C. §§ 1 *et seq.* (2102), and Commission Regulations ("Regulations"), 17 C.F.R. §§ 1 *et seq.* (2015).  *Ex. 1 ¶¶ 22-40 (Ex. D at pp. 2,8; D-1 at pp. 1 & 2; D-2)*  Further, the Defendants exercised discretionary trading authority over at least four customer trading accounts (*Ex. 2 ¶¶ 17-18; Ex. 3 ¶¶ 19-21; Ex. 9 at 20:17-23:13; 62:3-65:8; Exs. 13, 14, 15 ¶¶ 4, 7-9 (Exs. C, D*

---

[1] Plaintiff's Motions are supported by the Appendix of Exhibits, filed simultaneously herewith, which includes: testimony elicited during the hearing on Plaintiff's Motion for a Preliminary Injunction ("PI hearing") *(Ex. 9), from*:  Joseph Patrick, Senior Investigator with the CFTC; Darrin L. Goodrum, an investor who purchased the TradeMasters software; and Defendant Schacke; sworn investigative testimony from Schacke (*Exs. 5* and *7*) and from an individual that solicited some TradeMasters' investors, Ben Munger *(Ex. 8)*; and declarations from Patrick (*Ex. 1*); Goodrum (*Ex. 2*), investor Keri M. Caruthers (*Ex. 3*), investor Pete A. Lannie (*Ex. 4*), and investor Timothy Kopatich *(Ex. 6)*.  All of the attachments to these declarations and additional exhibits admitted into evidence at the PI hearing.  References to specific paragraphs of the Patrick declaration appear, for example, as follows:  "*Ex. 1 ¶ 17*" and an Exhibit to his declaration appear as, for example, "*(Ex.  C)*" Page numbers referenced in the deposition transcript will be referenced as, for example, *Ex. 5* at page 16, lines 4-6 as *Ex. 5 at 16:4-6* and an exhibit referenced in the deposition transcript for Ex. 6 is referred to, for example, as [*Ex. 39*], to correspond to the exhibit number assigned during the testimony.  The materials have been redacted to protect personal identifying information.  An un-redacted version is available upon request for review by the Court.

1    *and E))* without appropriate registrations with the Commission.  *Ex. 1 ¶¶ 11, 14 and (Ex. B at*

2    *pp. 2-3 and 4-5)*

3        On August 15, 2016, this Court entered a Statutory Restraining Order and scheduled the

4    PI hearing.  [Doc. No. 7]  Schacke filed his response to the PI motion on September 7, 2016

5    [Doc. No. 22] and his Answer to the Complaint (captioned "Opposition to Complaint") on

6    September 14, 2016.  [Doc. No. 31].  The PI hearing was held on September 16, 2016, and

7    Schacke appeared, *pro se.*  TradeMasters has not answered the Complaint, did not appear at the

8    PI hearing and a default has been entered against it.  [Doc. No. 42]  At the PI hearing, testimony

9    was elicited from Plaintiff's witnesses Darrin Goodrum, a customer of the Defendants, and

10   Joseph Patrick, the CFTC's investigator.  Schacke testified on his own behalf.  Following the

11   conclusion of the hearing, the Court granted the Plaintiff's motion for a Preliminary Injunction

12   on September 22, 2016 ("PI Order").  [Doc. No. 37]  The CFTC now moves for summary

13   judgment as a matter of law on all counts in its Complaint against Schacke and a default

14   judgment on all counts in its Complaint against TradeMasters.  The CFTC seeks entry of the

15   proposed order submitted herewith that includes Findings of Fact, Conclusions of Law, an Order

16   of Permanent Injunction, Disgorgement and a Civil Monetary Penalty pursuant to Section 6c of

17   the Act, 7 U.S.C. § 13a-1(2012) against both Defendants.

18   **II.      SUMMARY JUDGMENT STANDARD – MOTION AGAINST SCHACKE**

19       Summary judgment, as sought here against Schacke, is proper "if the pleadings,

20   depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

21   any, show that there is no genuine issue as to any material fact and that the moving party is

22   entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catretti,* 477

23   U.S. 317, 322 (1996).  An issue is deemed "genuine" if there is a sufficient evidentiary basis on

24   which a reasonable fact-finder could find for the nonmoving party and a dispute is "material" if

25   it could affect the outcome of the case.  *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248

26   (1986).

27       In determining summary judgment, "the moving party has the initial burden of

28   establishing the absence of a genuine issue of fact on each issue material to its case."  *C.A.R.*

*Transp. Brokerage Co. v. Darden Rests., Inc.,* 213 F. 3d 474, 480 (9ᵗʰ Cir. 2000) (citations omitted).  If the moving party satisfies its initial burden, the burden then shifts to the opposing party to establish that a genuine issue of material fact exists.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).  The Court does not weigh the evidence, but only determines if there is a genuine issue for trial.  *See Celotex Corp.,* 477 U.S. at 324.  In sum, "[t]he mere existence of a scintilla of evidence . . . will be insufficient."  *Anderson*, 477 U.S. at 252.  Further, only evidence which might be admissible at trial may be considered by a trial court in ruling on a motion for summary judgment.  Fed. R. Civ. P. 56(c).  In this case, the plaintiff respectfully submits that there are no genuine issues of material fact that remain for trial in the case against Defendant Schacke and that summary judgment should be entered as a matter of law against him.

### III.   LEGAL STANDARD FOR ENTRY OF DEFAULT JUDGMENT and SATISFACTION OF THE PROCEDURAL REQUIREMENTS – MOTION AGAINST TRADEMASTERS

The Federal Rules of Civil Procedure define the two-step process to obtain the default judgment sought here against TradeMasters.  Fed. R. Civ. P. 55(a), *Eitel v. McCool,* 782 F. 2d 1470, 1471 (9ᵗʰ Cir. 1986).  "First, [w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend . . . the clerk must enter the party's default."  Fed. R. Civ. P. 55(a).  Second, after the clerk enters default, a party must seek entry of default judgment under Federal Rule of Civil Procedure 55(b)."  In this case, the clerk entered a default against TradeMasters on November 4, 2016 [Doc. No. 42], thereby satisfying the initial procedural requirement.

Upon entry of default against a party, this circuit holds that the court should take the factual allegations in the non-defaulting party's complaint as true, except for allegations regarding damages.  *TeleVideo Sys., Inc. v. Heidenthal,* 826 F. 2d 915, 917-18 (9ᵗʰ Cir. 1987) (*citation omitted*).  "Nonetheless, although entry of default by the clerk is a prerequisite to an entry of default judgment, a plaintiff who obtains an entry of default is not entitled to judgment as a matter of right.  *Warner Bros. Entm't Inc. v. Caridi,* 346 F. Supp. 2d 1068, 1071 (C.D. Cal.

2004) (*citation omitted*).  Instead, whether a court will grant a default judgment lies within the discretion of the trial court.  *Aldabe v. Aldabe*, 616 F. 2d 1089, 1092 (9th Cir. 1980); *Toyo Tire and Rubber Co., Ltd., et al. v. Toyama Tyre Corp., Ltd., et al.,* 2014 WL 4987876 (D. Nev. 2014).  The Ninth Circuit has identified the following factors as relevant to the exercise of the court's discretion in determining whether to grant default judgment:  (1) the possibility of prejudice to plaintiff; (2) the merits of the plaintiff's substantive claims; (3) the sufficiency of the complaint; (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether default was due to excusable neglect; and (7) the policy favoring a decision on the merits.  *Eitel*, 782 F. 2d at 1471-72.  Each of the *Eitel* factors has been satisfied here.

**A.     The Plaintiff will be Prejudiced Absent the Entry of a Default Judgment**

The first *Eitel* factor considers whether the plaintiff will suffer prejudice if a default judgment is not entered.  In this case, the prejudice factor strongly favors entering the default judgment.   TradeMasters did not appear and was defaulted.  If default judgment is not entered against it, the CFTC will suffer the prejudice of having no means of recovery against TradeMasters.  *Liberty Ins. Underwriters Inc. v. Scudier*, 53 F. Supp. 3d 1308, 1318 (D. Nev. 2013) (citing *Pepsi Co., Inc. v. California Sec. Cans*, 238 F. Supp. 2d 1172, 1177 (C.D. Cal. 2002).

**B.     The Plaintiff's Complaint Sets Forth a Claim for Relief and Properly Pleads Violations of the Act and Regulations**

The second and third *Eitel* factors, the merits of the CFTC's claims and the sufficiency of its complaint, also favor entering default judgment.  A default judgment is appropriate "where the complaint sufficiently states a claim for relief under the 'liberal pleading standards embodied in Rule 8' of the Federal Rule of Civil Procedure. *Danning v. Lavine*, 572 F. 2d 1386, 1389 (9th Cir. 1978); *see also* Fed. R. Civ. P. 8."  *CFTC v. CIS Commodities, LLC, et al.,* 2013 WL 1944571 (D. Nev. 2013).  The CFTC has properly pled that Schacke, the sole owner and manager of TradeMasters, made material misstatements to investors with knowledge of their

falsity.  Section 2(a)(1)(B) of the Act and Regulation 1.2, 7 U.S.C. § 2(a)(1)(B); 17 C.F.R. § 1.2, provide that '[t]he act, omission or failure . . .  of any official . . . acting for any  . . . corporation . . . within the scope of his employment or office shall be deemed the act, omission or failure of such . . . corporation."  As such, the pleadings properly allege that TradeMasters is liable for Schacke's violations of Sections 4b(a)(1)(A) and (C), 4*o*, and 6(c)(1) of the Act and Regulation 180.1(a).  The pleadings also establish that Schacke, acting on behalf of TradeMasters, traded for public customers and that TradeMasters was not registered as a commodity trading advisor as was required, thereby establishing TradeMasters' violation of Section 4m(1) of the Act.  The complaint also alleges that TradeMasters' website utilized purported customer testimonials without prominently disclosing statements required by Regulation 4.41(a)(3) and, therefore, TradeMasters also violated that Regulation by its conduct and that of Schacke.  TradeMasters has not responded to the Complaint, has not attempted to dispute or defend against the allegations in the Complaint, and has not otherwise appeared in this action.  Therefore, these factors weighs in favor of granting default.

## C.   The Requested Monetary Relief is Proportional to TradeMasters' Conduct

The fourth *Eitel* factor requires the Court to consider "the amount of money at stake in relation to the seriousness of Defendants' conduct."  *PepsiCo.*, 238 F. Supp. 2d at 1176; *BMW of No. Am., LLC v. Quality Star Benzz, LLC,* No. 2:12-cv-00889, 2013 WL 1338233, at *4 (D. Nev. Mar. 29, 2013).  A default judgment may not be entered without a hearing on damages unless "the amount claimed is a liquidated sum or capable of mathematical calculation."  *Davis v. Fendler,* 650 F. 2d 1154, 1161 (9th Cir. 1981).  Further, the "hearing" requirement does not require "live testimony, but may instead rely on declarations submitted by the parties, so long as notice of the amount requested is provided to the defaulting party."  *Wecosign, Inc., v. IFG Holdings, Inc. et al.,* 845 F. sup. 2d 1072, 1079 (C.D. Cal. 2012); *Franchise Holding II, LLC v. Huntington Restaurants Group, Inc.,* 375 F. 3d 922, 929 (9th Cir. 2004) (finding that district court did not err in finding that no doubt remained as to the amount of judgment where amounts

5

necessary for calculation established by documentary evidence).   In sum, damage

determinations need not be made with absolute exactness as long as there exists "a reasonable

basis for computation."  *Lindy Pen Co. v. Bic Pen Corp.*, 982 F. 2d 1400, 1407 (9th Cir. 1993).

Plaintiff seeks $168,626 as disgorgement from TradeMasters, which is the amount of money

public customers invested for the purchase and use of the TradeMasters software. Ex. 15 ¶ 5

(Ex. A)  The plaintiff also seeks a civil monetary penalty of $504,000.  Plaintiff's request for

this relief is supported by Section 6c of the Act, 7 U.S.C. § 13a(c)(d)(1) and Regulation 143. 8,

17 C.F.R. § 143.8.  Therefore, the damages sought can be determined on the basis of the

submitted evidence and affidavits and obviates the need for a hearing.

**D.       Material Facts are Not in Dispute**

The fifth *Eitel* factor requires that the court consider the possibility of dispute as to any

material facts in the case.  *PepsiCo., Inc.,* 238 F. Supp. 2d at 1177. *BMW of No. Am., LLC,* 2013

WL 1338233, at *4.  "Upon entry of default, all well-pleaded facts in the complaint are taken as

true, except those relating to damages."  *PepsiCo., Inc.,* 238 F. Supp. 2d at 1177.  Thus, no

genuine dispute of material facts would preclude granting the CFTC's Motion.

**E.       TradeMasters' Default is not Attributable to Excusable Neglect**

The sixth *Eitel* factor considers the possibility that the default resulted from excusable

neglect.  *PepsiCo., Inc.,* 238 F. Supp. 2d at 1177. *BMW of No. Am., LLC,* 2013 WL 1338233, at

*5.  The evidence shows that TradeMasters was served by and through its sole owner and

manager, Schacke, on August 24, 2016, pursuant to Fed. R. Civ. P. 4(e)(2) and 4(h) [Doc. No.

21].  Thus, TradeMasters has had the Summons and Complaint for nearly two-and-a- half

months prior to the Clerk's Entry of Default on November 4, 2016.  [Doc. No. 42]  Thus, given

the extended period of time during which TradeMasters has failed to answer or otherwise

respond to the Complaint, it is unlikely that its failure to respond and subsequent default resulted

from excusable neglect.

**F.     Decision on the Merits**

"The seventh *Eitel* factor reflects a strong preference for deciding cases on their merits whenever reasonably possible.  *See Eitel*, 782 F. 2d at 1472.  'However, the mere existence of [Rule 55(b)] indicates that 'this preference, standing alone, is not dispositive.'  *PepsiCo. Inc.,* 238 F. Supp. 2d at 1177 (citing *Kloepping v. Fireman's Fund,* No. C 94-2684 THE, 1996 WL 75314, at *3 (N.D. Cal. Feb. 13, 1996)."  *Next Gaming, LLC v. Global Gaming Group, Inc.,* No. 2:14-cv-00071, 2016 WL 3750651 (D. Nev. July 13, 2016).  Thus, when confronted with TradeMasters' failure to appear and to respond to the complaint, it becomes impractical, if not impossible, to make a decision on the merits.  As such, the Court is not precluded from entering a default judgment against TradeMasters.

**IV.     STATEMENT OF FACTS FOR WHICH THERE IS NO GENUINE DISPUTE**

The Commission incorporates by reference the well-plead facts in the Commission's complaint.  [Doc. No. 1]  As noted, Defendant TradeMasters has failed to file any responsive pleadings.  [Doc. No. 41] and, therefore, the facts alleged in the Complaint should be taken as true for purposes of the Court's consideration of the Motion for Default Judgment against it.  *See* Fed. R. Civ. P. 8(b).  Further, both Defendants' illegal conduct is also conclusively established by the record evidence set forth below, which recites uncontested facts.

**A.     Background Facts And Facts Demonstrating That Schacke Was Acting On Behalf Of Trademasters**

1.     Defendant Schacke is an individual who resides in Antioch, California. *Ex. 1 ¶ 14; Ex. 5 at 16:4-6* AND Ex. 7 at 14:16-24.

2.     Schacke is, and at all times during the relevant period was the sole owner and manager of TradeMasters and, therefore, possessed and exercised control over TradeMasters. *Ex. 1 ¶ 14 (Ex. A at pp.2, 8, 9, 12-15); Ex. 9 at 33:18-34:7; Ex. 2 ¶ 6;Ex. 5 at 98:5-7 EX. 3 ¶ 2,3; Ex. 6 ¶2)*

3.   Schacke has never been registered with the Commission in any capacity. *Ex. 1 ¶ 14 (Ex. B at pp. 2-3); Ex. 9 at 35:3-10*

4.     Schacke failed the examination where he sought to become registered as a commodity trading advisor ("CTA"). *Ex. 7 at 136:5-24*

5.     Schacke never sought exemption from registration as a CTA. *Ex. 7 at 136:25-137:9.*

6.     Defendant TradeMasters is a Nevada limited liability company. *Ex. 1 ¶ 11 (Ex. A at pp. 2, 4, 6-8,9,  11-12, 15)*   The firm was registered as a limited liability company on August 7, 2013, and, at all relevant times, has maintained a business address in Las Vegas, Nevada. *Ex. 1 ¶¶11, 21 (Ex. A at p. 7; Ex. D at p.12)*

7.     TradeMasters is wholly owned and managed by Schacke, and during the relevant period Schake hired and supervised at least two salesmen who solicited public customers to purchase TradeMasters' automated trading software and to whom he gave commissions for referring customers to TradeMasters. *Ex. 1 ¶¶ 11, 14, 15-18; 46-47 and48-49 (Ex. A at pp. 2, 8-12, 15); Ex. 9 at 10:19-12:3; 74:23-75:5;33:18-34:7; Ex. 8 at 100:12-20, 135:16-22, 139:7-10, 140:12-20; Ex. 7 at 138:8-13, 139:25-140:20; Ex. 2 ¶¶ 2- 6; Ex. 3 ¶¶ 2, 3; Ex. 6 ¶ 2; Ex. 5 at 98:5-7; Ex. 4 ¶¶ 2-8; Ex. 6 ¶¶ 2-3; .*

8.     TradeMasters has never been registered with the Commission in any capacity. *Ex. 1 ¶¶ 11(Ex. B at pp. 4-5)*

**B.     The Defendants  Fraudulently Solicited Investors To Buy Trademasters' Trading Software**

9.     In mid-2013, Schacke bought a commodity futures trading software package off of the shelf, white labelled the product and called it his own TradeMasters trading software. *Ex. 1 ¶ 12; Ex. 5 at  36:2-6; 108:7-14; 130:2-22; 106:17-107:4; 130:5-131:17; 188:4-8.*

10.     Schacke sold his TradeMasters trading software to public customers via a "software license" within a range from $1,500 to $20,000.  *Ex. 1 ¶ 13; Ex. 2 ¶ 8; Ex., 3 ¶ 9; Ex. 4 ¶ 7; Ex. 5 at 81:16-82:11; Ex. 6¶ 5; Ex. 15 (Ex. A).*

11.     Schacke also charged customers a recurring "monthly access fee" of $250 to $1,000, which entitled customers to "system setup," "training activities and updates," and ongoing personal trading support from Schacke.  *Ex. 1¶ 13; Ex. 2 ¶ 8; Ex. 3 ¶ 9; Ex. 4 ¶ 7; Ex. 5 at 81:20-82:11; Ex. 9 at 13:1-14:3; 14:8-13; 14:25-15:2; 22:14-23:7.*

12.     From June 2013 to date, Schacke sold software licenses to, and collected monthly access fees from, 39 customers for a combined total of $168,626.  *Ex. 1 ¶¶ 37-51; Ex. 5 at 82:12-83:13; Ex. 15 at ¶ 5 and Ex. A.*

13.     At various times from July 2013 through March 2016, Schacke maintained several personal trading accounts at futures commission merchants ("FCMs") registered with the Commission. *Ex. 1 ¶¶ 52-60*  Schacke used the TradeMasters software to varying degrees when trading for his personal accounts.  *Ex. 5 at 166:4-16; 170:24-172:21; and 172:24-173:5.*

14.     In the aggregate, Schacke's personal accounts had a negative 22.95% rate of return for 2013, a negative 31.73% rate of return for 2014, a positive 281.47% rate of return for 2015 and a negative 34.7% rate of return through March 2016.  Overall, the accounts earned a net profit of $9,025.52 on a net investment of approximately $43,000 from July 2013 through June 2016. *Ex. 1 ¶¶ 52- 60(Exs. P, Q, R, S, T, U, V); Ex. 9 at 35:11-39:18*

15.     In June 2013, Schacke began marketing the TradeMasters product to the public through a website he developed for TradeMasters, [www.tradmastersusa.com](www.tradmastersusa.com), which was active through at least September 13, 2016.  *Ex.1 ¶¶ 12, 19, 20 (Exs. D, W); Ex. 9 at 42:10-43:20; Ex. 11; Ex. 7 at 99:10-24; Ex. 2 ¶ 7; Ex. 5 at 42:11-20; Ex. 7 at 50:5-15; 51:6-52:19.*

16.     Beginning in 2015, Schacke also used various social media devices such as YouTube to market the TradeMasters software. *Ex. 1 ¶¶ 19(b) (Ex. G), 22, 27, 41; Ex. 9 at 50:12-52:2; 40:5-7; Ex. 5 at 141:6-21*

17.     As of September 16, 2016, a TradeMasters' YouTube video had been viewed more than 25,000 times. *Ex. 9 at 50:12-52:7*

18.     Schacke published performance results on the website claiming TradeMasters had made large trading profits.  *Ex. 1 ¶¶ 20-23, 26-35(Exs. D at p. 11; D2; Ex. W at p. 43); Ex. 5 at 285:9-24*

19.     Although the website contains a hypothetical disclaimer, Schacke told customers that the performance results reflected on the website were generated from actual trading.  *Ex. 1 ¶ 23; Ex. 2¶ 5, 7; Ex. 4 ¶ 5; Ex. 9 at 17:15-19.*

20.     Because hypothetical trading results differ from actual live trading in the markets, the reporting of hypothetical trading results by licensed CTAs is limited to use for only a six-month period and must be accompanied by a disclaimer.  Logs are usually kept and maintained that can be used to calculate and verify the hypothetical trading results.  *Ex.9 at 44:7-47:9*

21.     The Defendants have no support for these claims of high profitability nor do they have any logs for their hypothetical trades.   *Ex. 1 ¶23; Ex. 5 at 260:20-263:14; Ex. 9 at 47:3-20; 50:12-51:11;Ex. 7 at 69:16-18, 70:19-71:19.*

22.     The TradeMasters website and YouTube videos made the following claims about the past profitability of the TradeMasters trading system:

     a.   a customer identified as "Gene Fisher" gained more than 500% in 2014;  *Ex. 1 ¶ 26 (Ex. D at p.11 ; Ex. D-2; Ex. W at p. 43)Ex. 9 at 48:5-17.*

     b.   a customer identified as "George C." gained more than 40% "in only 10 weeks;" *Ex. 1 ¶ 38 (Ex. D at p. 8; D-1 at p.2; Ex. W at p. 7); Ex. 9 at 56:2-9*

     c.   "most users manage to generate a monthly income of 5 to $10,000;" *Ex. 1 ¶ 27; Ex.5 at 285:17-24; Ex. 9 at 50:12-51:2*

     d.   some customers "quickly reached [income of] 15 to $30,000 each and every month."  *Ex. 1 ¶ 27; Ex. 5 at 285:17-24; Ex. 9 at 50:12-51:4*

23.     The claims in paragraph 22 are false because no customer achieved these results using the TradeMasters' software and Schacke admitted that they are not based on actual trading.  *Ex. 1 ¶¶ 26, 28, 34-37, 39; Ex. 5 at 288:21-290:5; 197:24-199:3.* These statements are also false because of the following specific facts:

a. Schacke never had a customer named "Gene Fisher" and Schacke admitted that no such customer ever existed. *Ex. 9 at 48:10-49:2; Ex. 5 at 200:17-201:4 and 203:5-10; Ex. 1 ¶ 26*

b. Schacke never produced evidence that any customer had attained a 40% return in only 10 weeks and Schacke never had a customer named "George C." *Ex. 9 at 56:2-57:1;  Ex. 1¶ 39; Ex. 5 at 197:24-199:3; Ex. 7 at 162:21-163:16*

c. Schacke could not identify anyone who made $5 to $10,000 monthly. *Ex. 5 at 288:21-290:5; Ex. 9 at 50:12-51:11; Ex. 7 at 104:14-105:17 and 108:19-111:4*

d. Schacke could not identify anyone who made $15 to $30,000 every month. *Ex. 9 at 50:12-51:11; Ex. 5 at 287:13-24*

24.   Schacke also used paid actor testimonials on his website, including a misleading purported "real customer story" claiming that a customer made a 300% return in just three months. *Ex. 1 ¶ 30 (Ex. D at pp. 2, 8, Ex. D-1 at p. 1; Ex. W at pp. 6-7); Ex. 10; Ex. 9 at 52:15-23.* Schacke paid this purported "real customer," who was described as a "stay at home mom," to give a video testimonial. *Ex. 1 ¶ 31(Ex. D at pp. 2-8; Ex. D-1 at p. 1; Ex. W at pp. 6-7)* Schacke did not disclose that this was a paid testimonial and that this individual was not a customer and had never been a customer.   Rather, the customer's results in this video were actually "cherry-picked" results from Schacke's personal proprietary trading account which were not representative of all of the trading that was done in his account. *Ex. 1 ¶¶ 32-37; Ex. 9 at 52:24-55:22.*

25.   Additionally, Defendants used the expression "set it and forget it" as a headline on most pages of the TradeMasters' website to describe the simplicity of the TradeMasters' software product. *Ex. 1 ¶ 22 (Ex. D at pp. 3,7,9,10,11); Ex. 11 at pp. 3, 7, 9, 11, 13, 15, 17-20, 23, 25, 30, 32, 34, 36-38, 41, 43, 44, 46, 47, 49, 50, 52, 53, 55, 64, 66-69, 71; Ex. 6 ¶ 3* The website explains that the TradeMasters' product is a "100% automated" trading robot that executes trades for a customer's trading account and it does not require any customer intervention to monitor and adjust the trading activity after initially entering "stops, targets and triggers." *Ex. 1¶ 24 (Ex. W at p. 22)*

26.     The TradeMasters software is not "fully automated" as claimed and requires customer intervention and "coaching" by Schacke.  Customers paid TradeMasters a monthly access fee to receive "coaching," which fee was not disclosed on the website. *Ex. 9 at 13:1-14:3; 14:25-15:2; 22:11-23:7; Ex. 2 ¶ 17; Ex. 6 ¶ 6*

27.     Schacke, in return, would "coach" his customers by telling them how to determine which markets to trade, quantity and timing parameters for their trades and how "to get out of a trade early because of a loss or a gain."  *Ex.5 at 172:14-18.*

28.     Schacke provided ongoing support to customers by sending them the daily "settings" for the TradeMasters' software so that it could execute trades.  *Ex. 9 at 13:1-24, 14:24-15:2; Ex. 2 ¶¶ 7, 17; Ex. 4 ¶ 16; Ex. 7 at 143:4-16.*

29.     Beginning in the summer of 2013, Schacke held weekly webinars with TradeMasters software users to recap the week's trading performance, instruct customers about day trading and provide information about releases of new software.  *Ex. 1 ¶ 25(Exs. D at p. 4 and  W. at p 1)*  The website promoted the webinars and stated that this instruction would be presented by "head coaches" with "more than 2 decades of active day trading" experience.  *Ex. 1 ¶ 25 (Exs. D at p. 4 and W at p. 1)*

30.     Schacke was the only "coach" ever associated with TradeMasters and he had no futures trading experience prior to marketing the TradeMasters software in June 2013.  *Ex. 5 at 99:24-100:12; 70:3-13; 280:1-281:24*

31.     At the webinars or "Sunday Hangouts" as Schacke called them, Schacke touted the profitable returns he was achieving using the TradeMasters software and said that the trading performance in his account and as reported on the website was based on actual live trading rather than hypothetical trading.  *Ex. 2 ¶ 13; Ex. 3 ¶ 13; Ex. 4 ¶ 15; Ex. 6¶14.*  Schacke has no support for the trading results that he published on the TradeMasters website. *Ex. 1 ¶ 23, 26, 28, 34-37, 39*

32.     Defendants also sent emails to customers containing a trading performance track record, which they represented to be actual trades, but which were, instead, hypothetical. Specifically, in or around July 2013, a TradeMasters salesman sent an email to a customer

containing an excel spreadsheet called "Money Management – Trade Plan." The salesman told the customer that the excel spread sheet contained trading results for the TradeMasters software. The trading results in the spreadsheet were categorized by market and showed the results for each day in each market. The spreadsheet showed that the TradeMasters software was generating steady profits. The salesman told the customer that the profits reported in the spreadsheet were from actual trades placed by the TradeMasters software in a real futures account. *Ex. 2 ¶ 5*

33.    In March 2014, a TradeMasters salesman sent a customer an excel file, which the salesman said contained trading performance for the TradeMasters software for January 2014 reflected in "points" with each point roughly equal to a one percent rate of return. The salesman said that the performance contained in the file was the actual trading performance of the TradeMasters software despite its labeling as hypothetical. The performance reported in the email showed that the TradeMasters software was achieving daily returns as high as 151.2 points and earned an average daily return of more than 10 points. Statements attached to the email, which were represented to be actual trading pursuant to the TradeMasters software, showed that an account earned net profits over $1,900 for the time period. *Ex. 4 ¶¶ 4-6(Exs. A-C)*

34.    By the end of 2014, Schacke began marketing a new software product, but continued to publish results on his website to prospective customers that resulted from his old software product without disclosing that he had changed software products. *Ex. 1 ¶ 23; Ex. 5 at 292:6-293:4; 188:2-189:2*

**C.    Trademasters Acted As A Commodity Trading Advisor And Schacke Acted As An Associated Person**

35.    Schacke provided technical support to customers using his software by sending an email or posting on a webinar the daily or weekly settings for the different markets that were being traded. *Ex. 9 at 13:1-24.*

36.    A TradeMasters customer would simply take the trade settings provided by Schacke and implement them for their account without knowing what the settings meant or why Schacke had recommended them. *Ex. 9 at 22:18-23:7*

37.     Some TradeMasters customers complained to Schacke that his TradeMasters trading software was not yielding the profitable results that were advertised and that they were, instead, losing money. *Ex. 2 ¶ 17; Ex. 3 ¶ 19; Ex. 6 ¶¶ 26-27*

38.     In response to at least three of the complaining customers, Messrs. Goodrum, Caruthers and Kopatich (the latter two of whom had a joint account), Schacke agreed to try to recover the losses they experienced by personally executing trades for their trading accounts as an additional service for the same TradeMasters' monthly access fee. *Ex. 2 at ¶¶ 17 and 18; Ex. 9 at 21:10-24; Ex. 3 ¶¶ 19-21; Ex. 6 ¶25*

39.     Schacke told customer Goodrum, a resident of Wellington Kansas, to send him his computer and Goodrum gave Schacke his login credentials in order to enable Schacke to trade Goodrum's account. *Ex. 9 at 8:9-10, 9:21-10:1, 21:10-24; Ex. 2at ¶¶ 17 and 18*

40.     Schacke made the trades in Goodrum's account from approximately January through March 2014.  During this period, Schacke told Goodrum that he was personally selecting the markets and timing of trades and stated that he was using the TradeMasters software to place trades in Goodrum's account. *Ex. 2 ¶¶ 17, 18*

41.     A review of the IP addresses for the computers that placed trades for Goodrum's account during the period from January through March 2014 confirms that two of the IP addresses were used to trade both Schacke's personal account and Goodrum's account during this period.  Also, geographically, the IP addresses correspond to the cities of Spring Hill, Brooksville and Brookridge, Florida. *Ex. 15 at  ¶¶ 7-9*

42.     Between at least January and July 2014, Schacke resided in Spring Hill, Florida. *Ex. 15 at ¶ 8.*

43.     The cities of Brooksville and Brookridge, Florida are within 7-12 miles of Schacke's residential community of Spring Hill, Florida. *Ex. 15 at ¶ 9.*

44.     Customer Keri Caruthers gave Schacke and TradeMasters his trading accounts' user name and password log-in credentials, and Schacke proceeded to trade for the Caruther's account on behalf of TradeMasters. *Ex. 3 ¶¶ 19-21*

45.     Schacke personally traded for a third account, that of customer Chris Waiganjo. Schacke and Waiganjo had an agreement which would pay Schacke a percentage of profits Schacke earned while he personally traded for Waiganjo's account which they discussed via Skype. *Ex. 9 at 63:6-65:8; Ex. 13*

**D.     Trademasters Failed To Provide Required Disclosures Concerning Testimonials**

46.     Defendants displayed client testimonials on the TradeMasters website. *Ex. 1 ¶¶ 29, 30-37, 38-40*

47.     As of February 13, 2016, the TradeMasters website contained at least five testimonials from purported customers who claimed that they made gains after using the TradeMasters software to manage their trading accounts. *Ex. 1 ¶ 29 (Ex. D at p.8; Ex. D-1 at pp. 1-2; Ex. W at pp. 6-7)*

48.     Defendants did not disclose anywhere on the TradeMasters website "that the testimonial may not be representative of the experience of other clients," or prominently disclose "that the testimonial is no guarantee of future performance or success" as Regulation 4.41 requires. *Ex. 1 ¶ 40*   Instead, the Defendants included a generic disclosure that did not mention testimonials and that was not in proximity to the testimonials, but was on the bottom of a separate webpage that did not contain any testimonials. *Ex. 1 (Ex. D at pp. 5-7)(Ex. W at p. 14)*

## V.     LEGAL ARGUMENT

**A.     TradeMasters and Schacke Committed Fraud in Violation of Section 4b(a)(1)(A) and (C) of the Act (Count One)**

Section 4b(a)(1)(A) and (C) of the Act, 7 U.S.C. § 4b(a)(1)(A), (C) (2012), makes it unlawful for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery that is made, or to be made, on or subject to the rules of a designated contract market, for or on behalf of any other person:

(A)  to cheat or defraud or attempt to cheat or defraud the other person;

***

(C)  willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with

15

respect to any order or contract for or . . . with the other person[.]

Defendants violated Section 4b(a)(1)(A) and (C) of the Act by knowingly or recklessly making material misrepresentations to induce members of the public to purchase commodity futures trading software to use for commodity futures trading.

To establish liability for fraud based on misrepresentations and omissions under Section 4b(a) of the Act, the Commission must prove that: (a) a misrepresentation, misleading statement, or omission was made; (b) with scienter; and (c) that the misrepresentation, statement or omission was material. *CFTC v. R.J. Fitzgerald & Co., Inc.*, 310 F.3d 1321, 1328 (11th Cir. 2002), *cert. denied*, 543 U.S. 1034 ( 2004). *See also In re Slusser*, [1998-1999 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 27,701, 1999 CFTC LEXIS 167 at *27, 1999 WL 507574 at *9 (CFTC July 19, 1999) (same); *aff'd, Slusser v. CFTC*, 210 F.3d 283 (7th Cir. 2000).

### 1.      Defendants Made Misrepresentations

"Whether a misrepresentation has been made depends on the 'overall message' and the 'common understanding of the information conveyed.'" *R.J. Fitzgerald*, 310 F.3d at 1328 (citing *Hammond v. Smith Barney Harris Upham & Co*., [1987-1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,617 at 36,657 & n.12 (CFTC Mar. 1, 1990)); *CFTC v. Kratville*, 796 F.3d 873, 891 (8th Cir. 2015) (CPOs fraudulently induced participants to invest in pool). Defendants made false representations on the TradeMasters website and through written and verbal communication with customers.  There is no dispute that Schacke fabricated the identities of many customers and their purported performance results (*See* Section III., the Local Rule 56.1 Statement of Facts, Paragraphs 18-34).

### 2.      Defendants Acted With Scienter

Scienter is established when a person's acts are performed "with knowledge of their nature and character." *Wasnick v. Refco, Inc*., 911 F.2d. 345, 348 (9th Cir. 1990) (internal quotation marks and citation omitted), and that the defendant acted with more than "mere negligence, mistake or inadvertence." *Id*.; *accord, Chu v. CFTC*, 823 F.3d 1245, 1251 (9th Cir.

May 25, 2016).  The Commission need not prove evil motive or intent to injure a client, or that Defendants wanted to cheat or defraud their customers.  *Cange v. Stotler & Co. Inc.*, 826 F.2d 581, 589 (7th Cir. 1987).  Instead, the Commission may demonstrate that a defendant committed the alleged wrongful acts "intentionally or with reckless disregard for his duties under the Act." *Drexel Burnham Lambert, Inc. v. CFTC*, 850 F.2d 742, 748 (D.C. Cir. 1988) (finding that recklessness is sufficient to satisfy scienter requirement).  To prove that conduct is intentional, the Commission need only show that a defendant's actions were "intentional as opposed to accidental."  *Lawrence v. CFTC*, 759 F. 2d 767, 773 (9th Cir. 1985).  To prove that conduct is reckless, the Commission must show that it "departs so far from the standards of ordinary care that it is very difficult to believe the [actor] was not aware of what he was doing."  *Drexel Burnham Lambert*, 850 F.2d at 748 (alteration in original) (internal quotation marks and citation omitted). In general, the knowledge requirement for fraud charges is satisfied by establishing that "the individual had knowledge of the matieral misrepresentation, was recklessly indifferent to the truth or falsity of a misrepresentation, or had an awareness of a high probability of fraud along with an intentional avoidance of truth." *FTC v. Garvey,* 383 F. 3d 891, 900 (citing *FTC v. Publ'g Clearing House, Inc.,* 104 F. 3d 1168, 1171 (9th Cir. 1997). Additionally, this Circuit has recognized that "the extent of an individual's involvement in a fraudulent scheme alone is sufficient to establish the requisite knowledge for personal restitutionary liability."  *FTC v. Affordable Media,* 179 F. 3d 1228, 1235 (9th Cir. 1999); *see also F.T.C. v. Am. Standard Credit Sys.,* 874 F. Supp. 1080, 1089 (C.D. Cal. 1994) ("the degree of participation in business affairs is probative of knowledge").

Here, the facts clearly support finding that Schacke acted with the requisite scienter, when acting on his own behalf and on behalf of TradeMasters, in that he made false statements to customers and arranged to have them included on the TradeMasters website.   The subject

statements were objectively false and misleading at the time Schacke made them, and Schacke knew that to be the case.  Schacke routinely reported performance numbers as resulting from actual trading when, in fact, he knew that they were only hypothetical results and were generated by what he calls his "sim account."  [*See Schacke's Answer to the Complaint,* Doc. 31 at ¶ 21] Schacke purposefully ignored his available actual trading results, instead choosing to only report these unverifiable hypothetical results. *Ex. 1 ¶¶ 52-60 and e.g., Ex. 5 at 43:18-44:10* Such conduct, at best, constitutes the "intentional avoidance of truth" that evidences Schacke's scienter.  Further, he admitted that he never kept trading logs that could be used to confirm these hypothetical results.

Schacke  fabricated some customer identities to make it appear that real customers were achieving profitable results through actual trading.  *Ex. 5 at 262:11-263:14; 200:17-201:4; 203:5-6; 241:7-18; Ex. 9 at 56:5-18*  Schacke said that he did this to protect his customers' privacy, but one customer's results were from his own proprietary trading account instead of a customer account.  The shield of using "placeholder names" as he sometimes referred to them was done without any legitimate rationale and further indicates his knowledge of the fraud. Schacke also defiantly claimed that it was not improper for him to report only his winning trading months and ignore the losing months for his account.  Such "cherry-picked" results are inherently misleading and are not representative of the overall trading, further evidencing that he had scienter.  *Ex. 9 at 54:15-55:18*

When confronted with specific false statements about customer performance, Schacke's responses also confirm his knowledge of the fraud and, at best, show his reckless indifference to the truth.  For instance, when asked about the claim that a customer  he identified as George C. gained more than 40% "in only 10 weeks,"  Schacke said that he never received this customer's statement corroborating the published results and that the customer testimonial "was supposed to

be deleted" from his website.  *Ex. 5 at 197:24-198:5*  When asked about a customer identified as "Gene Fisher" who purportedly gained more than 500% in 2014, Schacke responded that "the whole page was not supposed to be" on the TradeMasters website and that "Gene Fisher" was "just a placeholder name and this page is not supposed to be public at all."  *Ex. 5 at 202:13-21; 200:24-201:4*

### 3.    Defendants' Misrepresentations Were Material

A statement is material if "it is substantially likely that a reasonable person would consider the matter important in making an investment decision."  *CFTC v. Noble Wealth Data Information Servs, Inc*., 90 F. Supp. 2d 676, 686 (D. Md. 2000), *aff'd in relevant part, rev'd in part sub nom. CFTC v. Baragosh*, 278 F.3d 319 (4th Cir. 2002); *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).  Any fact that enables customers to assess independently the risk inherent in their investmental and the likelihood of profit is a material fact.  *CFTC v. Driver*, 877 F.Supp.2d 968, 978 (C.D. Cal. 2012) ("Driver's representations and omissions were false and material because they impacted the pool participants' decisions to invest, remain in the pool, or make additional investments."), *aff'd* 585 Fed. Appx. 366 (9th Cir. Oct. 7, 2014).   Misrepresentations regarding profit potential and risk "go to the heart of a customer's investment decision and are therefore material as a matter of law."  *Noble Wealth*, 90 F. Supp. 2d at 686 (citing *CFTC v. Commonwealth Fin. Group*, 874 F. Supp. 1345, 1353-54 (S.D. Fla. 1994)).

Defendants' misrepresentations and omissions regarding Schacke's commodity futures trading experience, trading performance track record using the TradeMasters' trading software, customer results using the TradeMasters' trading software, the fact that customer testimonials on the website were not from actual customers of TradeMasters and the fact that Schacke falsely represented to customers that the trading results reflected on TradeMasters' website were from actual trading when they were not, are all material to a reasonable investor's decision whether to purchase the TradeMasters software and thus violated Section 4b(a)(1)(A) and (C) of the Act, 7 U.S.C. § 6b(a)(1)(A) and (C).

**B.     Fraud by Manipulative or Deceptive Devices or Contrivances (Count Five)**

Because Schake knowingly or with reckless disregard for the truth made material misrepresentations to members of the public to induce them to purchase commodity futures trading software to use for commodity futures trading his misconduct also supports charges against both Defendants under Section 6(c)(1) of the Act and Regulation 180.1(a).

Section 6(c)(1) of the Act makes it unlawful for any person, in connection with any contract of sale of any commodity for future delivery, to use or employ any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission shall promulgate.  Regulation 180.1(a), in relevant part, makes it unlawful to: (1) use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud; (2) make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; or (3) engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person.

The Defendants violated Section 6(c)(1) of the Act and Regulation 180.1(a) by engaging in the same fraudulent and deceptive acts by which they violated Section 4b(a)(1) of the Act as discussed above.  Their misrepresentations and omissions regarding: Schacke's commodity futures trading experience, trading performance track record using the TradeMasters trading software, customer results using the TradeMasters trading software, the use of fictitious customer testimonials on the website and false representations to customers that trading results on TradeMasters's website were from actual trading, all violate Section 6(c)(1) of the Act and Regulation 180.1.  *See CFTC v. Hunter Wise*, 21 F. Supp. 3d 1317, 1347 (S.D. Fla. 2014) (After finding defendants "made material misrepresentations and materially misleading omissions with scienter," court "need only determine whether [defendants] did so in connection with purchase or sale of commodities" to find violations of 6(c) and Regulation 180.1).

**C.     TradeMasters Failed to Register as a CTA (Count Two)**

Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2012), in relevant part, makes it unlawful for any CTA to make use of the mails or other means or instrumentalities of interstate commerce in connection with its CTA business unless registered with the Commission as a CTA. TradeMasters acted as a CTA when for compensation or profit it exercised discretionary trading authority over three customer trading accounts while failing to register with the Commission as a CTA in violation of Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2012). *CFTC v. Vartuli*, 226 F.3d 94, 111 (2d Cir. 2000) (defendant acted as a CTA without engaging in protected speech in selling system as a trading program with automatic signals).

At the PI hearing, customer Goodrum testified that after growing frustrated with the results he was getting from the TradeMasters' software, he sent Schacke his physical computer and gave Schacke his account's log-in credentials.  Schacke then proceeded to execute the trades in Goodrum's account from January through March, 2014.   At the hearing, Schacke denied Goodrum's account of the events after making a similar denial in his Answer.  Schacke's testimony, however, is directly contradicted in Patrick's Supplemental Declaration confirming that Schacke's IP address was the one actually used to place the trades in Goodrum's account from January through March, 2014. *Ex. 15 ¶¶ 13(b)(c) and 7-9* Customer Caruthers' sworn declaration also states that Schacke personally traded for his and customer Kopatich's joint account.  The Commission also introduced evidence that Schacke traded for a fourth customer, Chris Waiganjo.  Waiganjo told the Commission that Schacke was trading his account pursuant to a deal that compensated Schacke for profits he made while trading Waiganjo's account.  Waiganjo's narrative to the Commission is corroborated by documents admitted into evidence at the PI hearing that outlined this deal.   Schacke provided no alternative explanation for this compensation arrangement tied to Schacke's success in trading for Waiganjo's account.

 In addition to his flat denials of these customers' descriptions, Schacke also asserted that the customers were mistaken about Schacke trading for them because the TradeMasters' software was automatically executing the trades rather than Schacke himself.  His explanation is implausible in light of the unrefuted testimony that the software was not fully automated and

always required "technical support" to adjust specific settings in order to enter trades.  *Ex. 9 at 13:1-21; 14:25-15:2; 22:11-23:7*

**D.     Schacke Failed to Register as an Associated Person (Count Three)**

Section 4k(3) of the Act, 7 U.S.C. § 6k(3) (2012), in relevant part, makes it unlawful for a person to be associated with a CTA as a partner, officer, employee, consultant, or agent, or a person occupying a similar status or performing similar functions, in any capacity which involves the solicitation of a client's or prospective client's discretionary account unless such person is registered with the Commission under this Act as an Associated Person ("AP") of such CTA.[2]  Section 4k(3) of the Act further makes it unlawful for a CTA to permit such a person to become or remain associated with the CTA in such a capacity if the CTA knew or should have known the person was not registered as an AP.

Schacke acted as an AP of TradeMasters because during the scope of his employment with TradeMasters he solicited at least three customer's discretionary accounts without the benefit of registration with the Commission as an AP of TradeMasters in violation of Section 4k(3) of the Act, 7 U.S.C. § 6k(3) (2012).

**E.     Fraud by a CTA and an AP of a CTA (Count Four)**

Section 4*o*(1) of the Act, 7 U.S.C. § 6*o*(1) (2012), in relevant part, makes it unlawful for CTAs, CPOs, and their APs, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, (A) to employ any device, scheme, or artifice to defraud any participant; or (B) to engage in any transaction, practice, or course of business that operates as a fraud or deceit upon any participant.  Section 4*o*(1) of the Act broadly prohibits fraudulent conduct and applies to all CTAs, CPOs, and their APs, whether registered, required to be registered, or exempted from registration.  *CFTC ex rel. Kelley v. Skorupskas*, 605 F. Supp. 923,

---

[2] Liability for failure to register attaches regardless of whether the defendant considers himself a CTA, if the defendant's activities meet the definition for purposes of the Act. *See CFTC v. Hall*, 49 F.Supp.3d 444, 450 (M.D.N.C. Sept. 30, 2014), *aff'd* 632 Fed. Appx. 111 (4th Cir. Dec. 9, 2015) (owner of website advertising trading system for futures contracts that advised subscribers when to open and close positions qualified as a CTA).

932 (E.D. Mich. 1985).  The same fraudulent conduct that violates Section 4b of the Act also violates Section 4o(1) of the Act.  *Skorupskas*, 605 F. Supp. at 932-33; *In re R&W Technical Servs. Ltd.*, [1998-1999 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 27,582, 1999 CFTC LEXIS 50, at *80 (CFTC Mar. 16, 1999), *aff'd in part R&W Technical Serv. Ltd. v. CFTC*, 205 F.3d 165 (5th Cir. 2000).

Unlike Section 4b of the Act, the language of Section 4o(1) does not expressly require "knowing" or "willful" conduct as a prerequisite for establishing liability.  In this regard, the CFTC has held "[a]lthough scienter must be proved to establish a violation of section 4b and section 4o(1)(A), it is not necessary to establish a violation of section 4o(1)(B)."  *In re Kolter*, [1994-1996 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,262 at 42,198 (CFTC Nov. 8, 1994) (aff'g grant of summary disposition).  The CFTC's view accords with a number of federal court decisions.  *E.g.*, *Commodity Trend Service, Inc. v. CFTC*, 233 F.3d 981, 993 (7th Cir. 2000); *Messer v. E.F. Hutton & Co.*, 847 F.2d 673, 678-79 (11th Cir. 1988); *see also First Nat. Monetary Corp. v. Weinberger,* 819 F. 2d 1334, 1342 (6th Cir. 1987) (holding that in order to succeed when alleging a §4o violation, the complainant "need prove only that the commodity trading advisor intentionally made the statements complained of, and not that the advisor acted with the intent to defraud."); *CFTC v. Savage*, 611 F.2d 270, 285 (9th Cir. 1979) (holding that Section 4o(1) requires only that the violator have acted intentionally, but it is not necessary that the defendant know that the result will be to defraud).

TradeMasters and Schacke used the mails or any means or instrumentality of interstate commerce while acting as a CTA and an AP of a CTA to employ a device, scheme or artifice to defraud TradeMasters' clients, and engaged in a transaction, practice or course of business which operated as a fraud upon TradeMasters' clients, by, among other things:  emailing, posting on the TradeMasters website and conducting webinars containing fraudulent misrepresentations and omissions of material facts to TradeMasters' clients and prospective clients, in violation of Section 4o(1)(A) and (B) of the Act, 7 U.S.C. §§ 6o(1)(A) and (B).  Because TradeMasters' and Schacke's fraudulent conduct violates Section 4b of the Act, by those same acts, TradeMasters and Schacke violated Section 4o(1)(A) and (B) of the Act.  *In re*

*Slusser*, [1998-1999 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 27,701 at 48,315 ("Where the record establishes that the respondents engaged in fraudulent conduct in violation of section 4b the Division has … surpassed its burden of proof with respect to section 4*o*.").

**F.    TradeMasters Failed to Provide Required Disclosures (Count Six)**

Regulation 4.41(a)(3), 17 C.F.R. § 4.41(a)(3) makes it unlawful for any CTA to refer to any testimonial, unless the advertisement or sales literature providing the testimonial prominently discloses, in pertinent part:  (i) that the testimonial may not be representative of the experience of other clients; and (ii) that the testimonial is no guarantee of future performance or success.  Schacke, while acting as a CTA, referred to testimonials on the TradeMasters Website without prominently disclosing the required statement in violation of 17 C.F.R. § 4.41(a)(3). *Hall*, 49 F.Supp.3d at 450.

**G.    Derivative Liability**

**1.    Controlling Person Liability for Schacke**

Schacke controlled TradeMasters and, as a controlling person, is liable for TradeMasters' violations of the Act pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012), because he did not act in good faith or knowingly induced, directly or indirectly, the act or acts constituting the violations.[3]

A "fundamental purpose" of the statute is "to reach behind the corporate entity to the controlling individuals of the corporation and to impose liability for violations of the Act directly on such individuals as well as on the corporation itself."  *R.J. Fitzgerald*, 310 F.3d at 1334 (quoting *JCC, Inc. v. CFTC*, 63 F.3d 1557, 1567 (11th Cir. 1995) (internal quotation marks

---

[3] Section 13(b) of the Act provides:

> Any person who, directly or indirectly, controls any person who has violated any provision of this Act or any of the rules, regulations, or orders issued pursuant to this Act may be held liable for such violation in any action brought by the Commission to the same extent as such controlled person.  In such action, the Commission has the burden of proving that the controlling person did not act in good faith or knowingly induced, directly or indirectly, the act or acts constituting the violation.

and citation omitted)).  To establish controlling person liability under Section 13(b) of the Act, the Commission must show:  (1) control; and (2) lack of good faith or knowing inducement of the acts constituting the violation.  *In re First Nat'l Trading Corp.,* [1992-1994 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,142, at 41,787 (CFTC July 20, 1994), *aff'd without opinion sub nom. Pick v. CFTC,* 99 F.3d 1139 (6th Cir. 1996).

To establish the requisite control, the Commission must show that a defendant possessed general control over the operation of the entity principally liable.  *See, e.g., R.J. Fitzgerald*, 310 F.3d at 1334 (recognizing an individual who "exercised the ultimate choice-making power within the firm regarding its business decisions" as a controlling person).  Evidence that a defendant is an officer, founder, principal, or the authorized signatory on the company's bank accounts indicates the power to control a company.  *In re Spiegel*, [1987-1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,103, at 34,767 (CFTC Jan. 12, 1988); *see also Apache Trading Corp.,* [1990-1992 Transfer Binder] Comm. Fut. L.  Rep. (CCH) ¶ 25,251, at 38,795 (CFTC Mar. 11, 1992) (finding that an individual who "maintained control over the economic aspects of the operations" of a firm was a controlling person of it).

To establish "knowing inducement" of the acts constituting the violation, the Commission must show that "the controlling person had actual or constructive knowledge of the core activities that constitute the violations at issue and allowed them to continue."  *JCC, Inc.,* 63 F.3d at 1568 (quoting *In re Spiegel,* [1987-1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,103, at 34,767 (CFTC Jan. 12, 1988)).  Controlling persons cannot avoid liability by deliberately or recklessly avoiding knowledge about potential wrongdoing. *Id.* at 34,767.

Schacke is TradeMasters' sole owner and manager, manages all of the day-to-day operations of TradeMasters, and is responsible for all of TradeMasters' operations.  He knew that TradeMasters was not registered as a CTA and that he was not registered as an AP of TradeMasters.  Schacke knowingly sent emails to TradeMasters' customers and prospective customers, posted on TradeMasters' website and held webinars containing fraudulent misrepresentations and omissions of material facts.  Therefore, Schacke did not act in good faith and knowingly induced, directly or indirectly, the acts constituting TradeMasters' violations

alleged here.  Schacke is therefore liable for TradeMasters' violations of Sections 4b(a)(1)(A) and (C) and 6(c)(1) of the Act, 4m(1) and 4*o*(1) of the Act 7 U.S.C. §§ 6b(a)(1)(A) and (C), 9, 6m(1), 6*o*(1) (2012), and Regulations 4.41(a)(3) and 180.1(a), 17 C.F.R. § 4.41(a)(3) and 180.1(a) (2015) as a controlling person pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012).

### 2.    TradeMasters is Liable as Principal for Schacke's Acts

Under Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2(2014), strict liability is imposed upon principals for the actions of their agents acting within the scope of their employment.  *Dohmen-Ramirez v. CFTC*, 837 F. 2d 847, 857-58 (9th Cir. 1988); *Rosenthal & Co. v. CFTC*, 802 F. 2d 963, 966 (7th Cir. 1986) (principals are strictly liable for the acts of their agents).  Schacke's actions were committed within the scope of his employment with  TradeMasters, and his operation of TradeMasters' business.  Thus, because Schacke committed the alleged violations while acting on behalf of TradeMasters, TradeMasters is liable for Schacke's individual acts constituting violations of the Act and Regulations pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2015).

## VI.    RELIEF SOUGHT

**A.    The Court Should Permanently Enjoin the Defendants from Future Violations**

Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a) (2012), authorizes the CFTC to seek injunctive relief when it appears that a person or entity has engaged, is engaging, or is about to engage in any act or practice that violates the Act or Regulations.  To make a proper showing that injunctive relief is merited under Section 6c(a) of the Act, the CFTC must show that a person violated and is likely to continue violating the Act, the latter of which may be inferred from past unlawful conduct."  *British Am. Commodity Options Corp.*, 560 F.2d at 142; *see also CFTC v. Sidoti*, 178 F.3d 1132, 1137 (11th Cir. 1999) (finding no abuse of discretion in permanently enjoining further violations "[i]n light of the likelihood of future violations"). In determining if there is a likelihood of future violations, courts consider a number of facts

including "the egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of defendant's assurances against future violations, the defendant's recognition of the wrongful nature of his conduct, and the likelihood that the defendant's occupation will present opportunities for future violations." *CFTC v. White Pine Trust Corp.,* 2007 WL 1754819 *7 (S.D. Cal. Apr. 20, 2007) (citing *SEC v. Ginsburg,* 362 F. 3d 1292, 1304 (11th Cir. 2004), *CFTC v. Hunt,* 591 F. 2d 1211, 1219 (7th Cir. 1979), *cert. denied,* 442 U.S. 921(1979).

In this case, permanent injunctive relief is most appropriate because of the ongoing nature of Defendants' misconduct.  Schacke continued to solicit new software purchasers for months after he knew that he and TradeMasters were under investigation by the Commission and until the very eve of this Court's entry of a Preliminary Injunction.  This conduct is highly suggestive of future violations of the Act.  *Ex. 9 at 42:16-43:20*  Permanent relief is also warranted because of the egregious nature of the fraud which spanned more than two years and victimized 39 public customers.  Finally, at the PI hearing, Schacke maintained that neither he nor TradeMasters did anything wrong and, thus, refrained from providing any assurances against future violations.

**B.     Additional Injunctive and Remedial Relief is Warranted**

This Court should also invoke its discretion under Section 6c(c) of the Act, 7 U.S.C. § 13a-1, to require the Defendants to "take such action as is necessary to remove the danger of violation of this Act," by permanently prohibiting them from trading for themselves and others, and permanently enjoining them from engaging in commodity trading activities which might again involve them in future violations.  *In re Staryk,* [2003-2004 Tranfer Binder] Comm. Fut. L. Rep. (CCH) ¶29,826 at 56,452 (CFTC July 23, 2004) (explaining that a bar prohibiting a defendant is appropriate when the record shows that [a defendant's] misconduct represents an inherent threat to the integrity of the futures markets in the public eye); *In re Miller,* [1994-1996 Transfer Binder] CCH ¶26,440 at 42,914 (CFTC June 16, 1995), *remanded on other grounds, Miller v. CFTC,* 197 F. 3d 1227 (9th Cir. 1999) (CFTC affirming with "no difficulty" the trial

court's permanent trading ban because defendant's pattern of wrongdoing extended over several years posed a danger to the integrity of the market sufficient to warrant a permanent ban).

A permanent trading ban against the Defendants prohibiting them from trading for themselves and others is appropriate here because they have repeatedly committed core violations of the Act by fraudulently soliciting 39 public customers over a period of more than two years.  This conduct has adversely affected investor confidence and the integrity of the futures market.   This is especially true since Schacke has refused to recognize the wrongfulness of the conduct.  Numerous courts have upheld permanent trading bans and injunctions broadly prohibiting "commodity-related activity."  *CFTC v. Wilshire Investment Management Corp.,* 531 F. 3d 1339 (11th Cir. 2008) (holding that the district court did not abuse its discretion in broadly prohibiting defendants from engaging in any commodity-related activity), citing *CFTC v. Noble Wealth Data Information Services,* 90 F. Supp. 2d 676, 692 (D. Md. 2000) (a permanent injunction prohibiting the defendant from engaging in any commodity-related activity, including soliciting customers and funds was appropriate because of the "pervasiveness and seriousness" of the violations) which was upheld by the Fourth circuit in *CFTC v. Baragosh,* 278 F. 3d 319, 329 (4th Cir. 2002).  *See, also, CFTC v. CIS Commodities, LLC, et al.,* 2014 WL 3368325 (D. Nev. 2014) (ordered permanent trading ban and a ban on other commodity-related activity in a case involving the misappropriation of $175,000 of public customers' funds and issuance of false statements to customers).

**C.    The Court Should Order Defendants to Disgorge Their Gains**

This Court should order the Defendants to disgorge the monetary benefits of their unlawful activity.  "District courts have the power to order disgorgement as a remedy for violation of the Act for 'the purpose of depriving the wrongdoer of his ill-gotten gains and deterring violations of the law."  *CFTC v. American Metals Exchange Corp.,* 991 F. 2d 71, 76 (3rd Cir. 1993) (citing *CFTC v. British Am. Commodity Corp.,* 788 F. 2d 92, 94 (2d Cir. 1986).  When ordering disgorgement, the amount should be equal to the extent of the defendants' unjust enrichment.  *CFTC v. Levy,* 541 F. 3d 1102, 1113 (11th Cir. 2008).  It is also immaterial in the

determination of this sum whether the defendant has the ability to pay the amount of the disgorgement.  *SEC v. Warren,* 534 F. 3d 1368, 1370 n. 2 (noting that "[a] contrary rule would allow con artists to escape disgorgement liability by spending their ill-gotten gains.")

The Commission requests $168,626 as disgorgement, to be paid jointly and severally by the Defendants.  This figure represents Defendants' profits from sales of the TradeMasters software license and ongoing customer fees.  Further, the Commission requests to distribute any disgorgement amount collected to Defendants' defrauded customers. *See SEC v. Fischbach Corp.,* 133 F. 3d 170, 175-76 (2nd Cir. 1997) and *SEC v. Cavanagh, et al.,* 445 F. 3d 105, 117 (2nd Cir. 2006).

**D.     The Court Should Impose a Substantial Civil Monetary Penalty Against Defendants**

The Commission submits that a civil monetary penalty ("CMP") of $504,000 against the Defendants, jointly and severally, is appropriate due to the grave nature of their conduct which violated core anti-fraud provisions of the Act.

Pursuant to Section 6c(d)(1) of the Act, "the Commission may seek and the Court shall have jurisdiction to impose  . . . on any person found in the action to have committed any violation, a civil penalty in the amount of . . . triple the monetary gain to the person for each violation" or $140,000 for each violation of the Act.  7 U.S.C. § 13a(c)(d)(1) and 17 C.F.R. § 143.8.  In deciding the magnitude of the CMP, the Court should fashion it in a manner "appropriate to the gravity of [the] offenses and sufficient to act as a deterrent." *Miller v. CFTC,* 197 F. 3d 1227, 1236 (9th Cir. 1999).  Conduct that violates the core provisions of the Act should be considered extremely serious.  *JCC, Inc. v. CFTC,* 63 F. 3d 1557, 1571 (11th Cir. 1995). Further, the civil penalties imposed should make it financially detrimental to a defendant to comply with the Act and Regulations so that the defendant would rather comply than risk a violation.  *In re Grossfeld,* [1996-1998 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,921 at 44,467-8 (CFTC Dec. 10, 1996), 1996 WL 709219 (CFTC); aff'd sub nom. *Grossfeld v. CFTC,* 137 F. 3d 1300 (11th Cir. 1998).

This case warrants the imposition of significant monetary penalties.  The Defendants committed repeated violations of the core antifraud provisions of the Act for more than two years that resulted in significant customer losses.  Each instance of misrepresentations made by the Defendants to customers constitutes separate violations of the Act.  Given the multiple instances of misstatements in this case, the maximum statutory amount the Commission could seek is many multiples of $140,000, resulting in a very substantial penalty.  Alternatively, the Act authorizes the Commission to obtain a CMP of up to three times the gain to the Defendants, which amounts to $505,878.  *See* 7 U.S.C. § 13a-1(c)(1)(A).  In this case, the Commission respectfully requests that the Court order Defendants to pay, jointly and severally, a CMP of $505,878.

## VII.   CONCLUSION

For the foregoing reasons, the CFTC requests that the Court issue an order granting summary judgment against Schacke and a default judgment against TradeMasters.  Further, the CFTC requests that the Court issue an order granting a permanent injunction against both Defendants, disgorgement of $168,626, to be paid jointly and severally, and a civil monetary penalty of $505,878, to be paid jointly and severally.  A proposed order granting this relief is submitted herewith.

Dated:  December 20, 2016                              Respectfully submitted,

**/s/Susan B. Padove**
Susan B. Padove
Senior Trial Attorney
spadove@cftc.gov
Illinois A.R.D.C. No. 3127019
Indiana No. 11477-98

Susan Gradman
Chief Trial Attorney
sgradman@cftc.gov
Illinois A.R.D.C. No. 6225060___

Scott R. Williamson
Deputy Regional Counsel
swilliamson@cftc.gov

30

Illinois A.R.D.C. No. 06191293

Rosemary Hollinger
Regional Counsel
rhollinger@cftc.gov
Illinois A.R.D.C. No. 3123647

Commodity Futures Trading Commission
525 West Monroe Street, Suite 1100
Chicago, Illinois 60661
(312) 596-0544 (Padove)
(312) 596-0700 (office number)
(312) 596-0714 (facsimile)

**PROOF OF SERVICE**

I hereby certify that on December 20, 2016, I caused  a copy of the following:

- **PLAINTIFF'S COMBINED MOTIONS AND MEMORANDA FOR SUMMARY JUDGMENT AGAINST DEFENDANT SCHACKE AND DEFAULT JUDGMENT AGAINST DEFENDANT TADEMASTERS AND REQUEST FOR A PERMANENT INJUNCTION AND OTHER RELEIF AGAINST BOTH DEFENDANTS**

- **[PROPOSED] ORDER GRANTING PLAINTIFF CFTC'S MOTION FOR SUMMARY JUDGMENT AGAINST SCHACKE AND DEFAULT JUDGMENT AGAINST TRADEMASTERS and IMPOSING A PERMANENT INJUNCTION AND OTHER RELIEF**

to be served upon:
Mirko Schacke, individually, and on behalf of TradeMasters USA, LLC,
2242 Larkin Ct.
Antioch, CA 94531

By UPS overnight courier and by email to:  mcschacke@yahoo.com and trademasterusa@gmail.com.

/s/**Susan B. Padove**
Susan B. Padove
Senior Trial Attorney
spadove@cftc.gov
Illinois A.R.D.C. No. 3127019

Attorney for Plaintiff
Commodity Futures Trading Commission
525 West Monroe Street, Suite 1100
Chicago, Illinois 60661
(312) 596-0544 (Padove)
(312) 596-0700 (office number)
(312) 596-0714 (facsimile)